IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CT-3271-FL

| | | |
|---|---|---|
| MOHAMMED NASSER JILANI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONNIE HARRISON, Warden, Wake County Sheriff's Office; JUAN ADAMS, Officer, Wake County Sheriff's Office; and WAKE COUNTY SHERIFF'S OFFICE, | ) ) ) ) ) | ORDER |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion for summary judgment (DE 38). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants defendants' motion.

## STATEMENT OF THE CASE

On October 19, 2015, plaintiff, a pretrial detainee incarcerated at Wake County jail during the relevant time period, filed this civil rights action pro se pursuant to 42 U.S.C. § 1983, against defendants Donnie Harrison ("Harrison") and Juan Adams ("Adams"). Plaintiff alleges in his original verified complaint that on June 17, 2015, defendants falsely accused plaintiff of communicating threats while plaintiff was incarcerated, causing plaintiff to be detained in Wake County jail in disciplinary segregation for 30 days. (Complaint (DE 1)). On May 2, 2016, the court completed its frivolity review and ordered that the case proceed. (DE 9). On September 2, 2016, plaintiff filed his unverified amended complaint, adding defendant Wake County Sheriff's Office ("Sheriff's Office"), and alleging that defendants are "responsible for negligence, wrongful

segregation, physically restraining him without cause, malice, harassment, breach of duty, misconduct, character defamation, false imprisonment, wrongful imprisonment, wrongful arrest and false arrest, breach of privacy, and medical malpractice/negligence." (DE 24 at 1). Plaintiff also clarified that he is seeking money damages and relief pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and brings claims against defendants Harrison and Adams in both their individual and official capacities. (Id.).

The court entered a case management order on September 7, 2016, directing in part that all dispositive motions were due by February 9, 2017, which deadline the court subsequently extended twice, to May 10, 2017. (DE 25, DE 34, DE 37). On May 10, 2017, defendants filed the instant motion for summary judgment and submitted in support of their motion the following: materials related to charges brought against plaintiff prior to June 17, 2015; multiple grievances filed by plaintiff while incarcerated during the relevant time period, including jail staff responses; materials related to the June 17, 2015 incident involving defendant Adams, including incident and investigation reports, disciplinary hearing report, conditions of release, warrant for plaintiff's arrest, and additional court filings made by plaintiff; jail's dental care policy; records regarding the handling of plaintiff's legal mail; jail inmate log; and affidavits from the following persons employed at Wake County sheriff's office: defendant Adams; Brenda Cooke ("Cooke"), sergeant; Keith Curran ("Curran"), detention officer; Abderrazzak Elkhoudiri ("Elkhoudiri"), deputy sheriff; Eduardo Maldonado ("Maldonado"), detention officer; Heidi Steinbeck ("Steinbeck"), captain and administrative officer; and Obinnaya C. Umesi ("Umesi"), medical director.

After several extensions of time, plaintiff filed his response in opposition to the instant motion on August 1, 2017, and in support of his response plaintiff filed most of the same supporting

documents as filed by defendants. Plaintiff also filed additional materials relating to charges brought against plaintiff prior to June 17, 2015; an appeal submitted by plaintiff regarding the disciplinary hearing; letter plaintiff received from mail room staff regarding legal mail; and affidavits from plaintiff[1] and Bonnie Jilani, plaintiff's mother.

Additionally, during this time period, plaintiff filed a motion for preliminary injunction on July 7, 2017, which the court denied on July 26, 2017. (DE 59).

### STATEMENT OF THE FACTS

Except as otherwise noted below, the facts in light most favorable to plaintiff are as follows.

A.    Allegations Stemming from June 17, 2015

Prior to June 17, 2015, plaintiff was being held in Wake County jail for multiple charges. (DE 43 at 47-71; DE 64 at 4-19). On June 17, 2015, plaintiff submitted a grievance to the officer on duty, defendant Adams. (Pl's. Aff. at 85; DE 43 at 4-6; DE 64 at 20-22). This grievance, which appears to have been made on a carbonless copy form, concerned previous grievances submitted by plaintiff that had not been addressed. (DE 43 at 4-6; DE 64 at 20-22). On the same day, part of plaintiff's grievance was returned to plaintiff by Curran, who had found the yellow copy of the grievance in the trash, with a notation on the grievance stating that defendant Adams had spoken with plaintiff, which plaintiff alleges defendant Adams did not, and had forwarded the grievance to Lt. Baggett. (Pl's. Aff. at 86; see DE 64 at 20 ("On 6/17/15 I Officer Adams spoke with inmate Mohammed about his paper that was thrown in the trash. Forward to Lt. Baggett.").

---

[1] Plaintiff's affidavit can be found at DE 64 at 83-109.

Plaintiff then asked defendant Adams "why he would not enforce that [plaintiff's] grievance be properly submitted and explained to [defendant Adams] that [plaintiff] was going to submit another inmate grievance form on [defendant Adams] for [defendant Adams's] conduct." (Pl's Aff. at 87). Defendant Adams became "defensive" and "aggressive" towards plaintiff, informed plaintiff that he was being placed on 24-hour lockdown, searched plaintiff's cell, and stated to Curran "I am going to show Mr. Mohammed that I do follow every rule." (Id.). Defendant Adams searched plaintiff's cell, finding a torn rag used for cleaning, and rifled through plaintiff's possessions to the extent of damaging certain items. (Id. at 88). Defendant Adams mocked plaintiff during this time and stated that defendant Adams "was very good at submitting paperwork that [plaintiff] would not be getting out of the hole for awhile" and that plaintiff was "stupid" and that defendant Adams "gets to go home at night and [plaintiff] would be stuck in my cell." (Id. at 88-89).[2]

Defendant Adams charged plaintiff with multiple jail rule violations including property damage, interfering with lockdown, failure to obey orders, disrespecting staff, and threatening staff. (Id.; DE 43 at 13). Defendant Adams denies the allegations in the previous paragraph and alleges instead that on June 17, 2015, plaintiff started yelling at him from his cell about a grievance having been thrown away, had torn a jail-issued towel in his cell, and threatened to kill defendant Adams when he sees him at Walmart, including telling defendant Adams to "check [plaintiff's] reason for being in jail," presumably as a threat in that plaintiff had been charged with possession of a gun by a convicted felon among other drug charges. (DE 43 at 12, 24, 93).

---

[2] Plaintiff alleges that defendant Adams "was retaliating and punishing me because I caught him in an act of dishonesty, deceit, and misrepresentation to the sheriff's office while he was on duty," presumably referring to defendant Adams's alleged mishandling of plaintiff's grievance. (Pl's Aff. at 87).

In any event, it is undisputed that defendant Adams notified the officer in charge, Lt. Baggett, that plaintiff had made a threat against him. (DE 43 at 93). A jail supervisor arranged for a deputy to investigate the alleged threat against defendant Adams separately from the other alleged jail rule violations. (Id.). Deputy Elkhoudiri spoke with defendant Adams, who stated he felt threatened by plaintiff's statements. (Id. at 24).[3] Thereafter, Elkhoudiri found probable cause to arrest plaintiff without a warrant, arrested plaintiff, and transported plaintiff to Wake County detention center, where magistrate judge Adam Everett issued an arrest warrant, finding probable cause to find plaintiff

> unlawfully and willfully did threaten to physically hurt the person of Juan Adams. The threat was communicated to Juan Adams by stating that he was going to kill officer Juan Adams when he sees him at Walmart when the defendant gets out of jail, and the defendant repeatedly stated that he was charged with possession of firearm by felon, and the threat was made in a manner and under circumstances which would cause a reasonable person to believe that the threat was likely to be carried out and the person threatened believed that the threat would be carried out.

(DE 43 at 27, 103; DE 64 at 29).[4]

On June 19, 2015, a detention disciplinary hearing was held where plaintiff was found guilty of threatening staff, based on "the written report by Officer Adams, the investigation report provided by Lt. Baggett, the outside charges handed to Jilani by Wake County, and the statement by Jilani,"

---

[3] Additionally, Elkoudiri testifies that he had discussed the incident with plaintiff and plaintiff had admitted he told defendant Adams "to check his reason for being in jail" and "was mad at the time he made the statement," (DE 43 at 24, 103), although plaintiff denies this admission, (DE 62 at 4; DE 64 at 32).

[4] Magistrate judge Adam Everett typed but did not sign the warrant for plaintiff's arrest. (DE 43 at 27; DE 64 at 29). Although it appears plaintiff argues this somehow makes the arrest warrant invalid, this is not the case. See Federal Rule of Civil Procedure 5 (allowing documents to be electronically signed).

and was placed on disciplinary segregation for 30 days. (DE 43 at 13-15; Pl's. Aff. at 89, 92; DE 64 at 24-26).[5] Plaintiff was found not guilty of all other charges. (Id.).

During disciplinary segregation, plaintiff "suffered 30 long days in a small cell depressed, sad, and hungry because of the incident," submitting "sick calls because I became claustrophobic," had "bad dreams," and "would cry." (Pl's Aff. at 95). Also during this time, a no-contact order was in place between plaintiff and defendant Adams, (DE 43 at 19; DE 64 at 27); however, plaintiff alleges that during his time during segregation defendant Adams multiple times mocked plaintiff about the situation and friends and co-workers of defendant Adams continually harassed plaintiff. (Pl's. Aff. at 92, 96). On September 28, 2015, plaintiff appeared in Wake County District Court and was found not guilty of communicating threats to defendant Adams. (DE 43 at 28). Thereafter, plaintiff submitted a grievance regarding defendant Adams's misconduct. (Pl's. Aff. at 94; DE 64 at 49).[6]

B.    Inadequate Dental Care

Plaintiff additionally alleges that he did not receive proper dental care while confined at Wake County jail. (Pl's. Aff. at 99). During his time of confinement, plaintiff had multiple dental problems, submitted sick call forms regarding them, and was taken to see the dentist. (Id. 99-100).

---

[5] Plaintiff argues that the reports submitted by Lt. Baggett incorrectly assert that Lt. Baggett had first-hand knowledge about the incident in question, which could not be true, in that Lt. Baggett did not witness said incident, and that Lt. Baggett failed to investigate plaintiff's side of the story. (Pl's Aff. at 91). Review of Lt. Baggett's reports indicates that Lt. Baggett reported what he had seen of the incident on camera, with no audio, but additionally Lt. Baggett reports that plaintiff "threatened to kill [defendant Adams] if he sees him at Walmart." (See, e.g., DE 43 at 16). The report does not provide any basis of Lt. Baggett's knowledge as to the latter information.

[6] Plaintiff was released from Wake County jail on July 21, 2016. (DE 43 at 70-71). Although plaintiff argues otherwise, the undisputed evidence before the court is that plaintiff was detained at Wake County jail prior to June 17, 2015 until after September 28, 2015 on multiple charges unrelated to the communicating threats charge. (Id. at 47-60, 111-12). Therefore, plaintiff's only additional incarceration as a result of the June 17, 2015 events concerning defendant Adams is the time plaintiff spent in disciplinary segregation.

At one point, a nurse informed him that one of his teeth "could possibly be saved, but . . . the dentist would only pull the tooth." (Id. at 99). Plaintiff states that he had no other option "but to have the tooth pulled or I would continue to suffer with extreme pain and suffering." (Id. at 99-100). While incarcerated, plaintiff had multiple teeth removed. (Id. at 99-100).

## C.    Legal Mail

During his confinement, plaintiff's legal mail was opened and read outside his presence by jail staff. (Pl's. Aff. at 104; DE 64 at 70). Plaintiff's legal mail was tampered with and did not arrive at various courts when sent, and plaintiff has been denied access to the jail's legal mail log book and certified notification. (Pl's. Aff. at 105; DE 43 at 72-83; DE 62 at 12).

## D.    Additional Allegations

Plaintiff additionally alleges other actionable offenses occurred during the time he was detained in Wake County jail. First, plaintiff alleges he was subjected to hundreds of hours worth of lockdowns and segregation due to shortages of jail staff, including every Friday night, with too few hours of recreation and no opportunity for fresh air, inconsistent with jail policy. (Pl's. Aff. at 102-3). Second, Cooke refused to investigate why plaintiff was not allowed to visit the dentist after plaintiff submitted a sick-call form, stating that she could care less about his toothache, which was overheard by Maldonado, who subsequently lied and stated he had not heard the comments as alleged. (Id. at 96-97; DE 43 at 84-89). Plaintiff states that he submitted a "notice of intent" by mail to defendant Harrison concerning the last incident and generally concerning misconduct by jail staff. (Pl's. Aff. at 98; DE 43 at 88-89; DE 64 at 74-75).[7]

---

[7] The court notes that unrelated to plaintiff's complaint or amended complaint, plaintiff additionally argues at length in summary judgment response papers as to alleged violations of his rights that occurred prior to June 17, 2015; violations of his rights that have occurred after June 17, 2015 but have been committed by person unrelated to this lawsuit; or violations occurring after June 17, 2015, that are based on claims not identified by plaintiff previously. These

**DISCUSSION**

A.     Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial.  Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Anderson, 477 U.S. at 250.

B.     Analysis

The court will first address plaintiff's § 1983 claims against defendant Adams regarding events that took place on June 17, 2015.  The court will then address plaintiff's remaining § 1983 claims concerning: 1) deliberate indifference to plaintiff's medical needs,  2) mishandling of legal mail, 3) mishandling of grievance forms, 4) excessive lockdowns, and 5) verbal abuse.  The court will then turn to claims directed at defendant sheriff's office and claims directed at defendant Harrison.  Finally, the court will address plaintiff's state-law claims.

---

claims, including claims regarding excessive confinement, inability to attend court hearings, inadequate and inedible food, inadequate and inaccessible law resources, and inability to shower out of handcuffs, are beyond the scope of the present litigation and are thus not addressed by the court.  See Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) ("We have previously held, along with the Fifth, Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not raise new claims after discovery has begun without amending his complaint.").  To the extent plaintiff wishes to assert these unrelated claims, plaintiff may initiate a new action.

1.    Claims Against Defendant Adams

Plaintiff's primary focus in his filings is that defendant Adams, on June 17, 2015, falsely accused plaintiff of communicating threats, resulting in plaintiff being placed in disciplinary segregation for 30 days. Plaintiff alleges that this accusation was in retaliation for plaintiff's complaints regarding the way in which his grievance had been handled by defendant Adams.

a.    Retaliation Claim

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). A claim of retaliation is treated with skepticism in the prison context. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (noting that "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prison misconduct") (citation omitted). For an inmate to state a colorable claim of retaliation, the alleged retaliatory action must have been taken with regard to the exercise of some constitutionally protected right, or the retaliatory action itself must violate such a right. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). A plaintiff must allege specific facts supporting the claim of retaliation because bare assertions of retaliation do not establish a claim of constitutional dimension. Id. at 74-75. Mere "temporal proximity" between the inmate's protected activity and the official's allegedly retaliatory act "is simply too slender a reed on which to rest" a retaliation claim. Wagner v. Wheller, 13 F.3d 86, 90-91 (4th Cir. 1993) (requiring plaintiff to show "a causal relationship between the protected expression and the retaliatory action").

In this case, plaintiff alleges that he threatened to file a grievance, complaining of defendant Adams's behavior, (Pl's Aff. at 87), and that defendant Adams, in retaliation, falsely accused plaintiff of threatening defendant Adams, (id.; DE 64 at 31). However, plaintiff's only factual support for this claim are his repeated but conclusory assertions that defendant Adams's accusation was false and was made for the reason plaintiff asserts. Plaintiff's conclusory allegations of retaliation are insufficient to allege a constitutional violation. See Adams, 40 F. 3d at 74.

Thus, there is no constitutional violation, and defendant Adams is entitled to qualified immunity for these claims. See Gregg v. Ham, 678 F.3d 333, 341 n.7 (4th Cir. 2012) ("To prevail under qualified immunity, [defendant] has to show either that there was no constitutional violation or that the right was not clearly established."). Defendant Adams is entitled to summary judgment on plaintiff's retaliation claim.

        b.        Due Process Violation

The Fourteenth Amendment to the Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. "[I]n order to claim entitlement to the protections of the due process clause—either substantive or procedural—a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" Stone v. University of Maryland Medical System Corp., 855 F.2d 167, 172 (4th Cir. 1988) (quoting Board of Regents v. Roth, 408 U.S. 564 (1972); Daniels v. Williams, 474 U.S. 327 (1986)).

The Fourth Circuit has held that "administrative segregation from the general population does not implicate a protected liberty interest absent a showing of specific facts that conditions of

10

confinement are significantly more onerous." Thompson v. Commonwealth of Virginia, 878 F.3d 89, 110 (4th Cir. 2017) (citing Incumaa v. Stirling, 791 F.3d 517, 531 (4th Cir. 2015)). Although plaintiff argues he was extremely unhappy while in segregation, (see Pl's Aff. at 96 (asserting he "suffered 30 long days in a small cell depressed, sad, and hungry because of the incident," submitting "sick calls because I became claustrophobic," had "bad dreams," and "would cry"), plaintiff does not offer any evidence that the conditions of confinement were significantly more than onerous. See Incumaa, 791 F.3d at 531 (finding "severe" conditions of confinement where "uncontested evidence" provided "severely restrictive and socially isolating environment of the SMU in contrast to the general population—the near-daily cavity and strip searches; the confinement to a small cell for all sleeping and waking hours, aside from ten hours of activity outside the cell per month; the inability to socialize with other inmates; and the denial of educational, vocational, and therapy programs").

Plaintiff's claims are more appropriately brought, as analyzed above, pursuant to the First Amendment. See Thompson, 878 F. 3d at 110 ("To the extent that Mr. Thompson alleges that segregation was retaliatory punishment, that argument is better addressed under either the First or Eighth Amendment.").

      c.      False Arrest, False Imprisonment, and Malicious Prosecution

Section 1983 claims for false arrest and false imprisonment properly are evaluated under the Fourth Amendment to the United States Constitution. See Rogers v. Pendleton, 249 F.3d 279, 294 (4th Cir. 2001) (providing that claims of false arrest and false imprisonment "are essentially claims alleging a seizure of the person in violation of the Fourth Amendment"); Harris v. Foy, No. 5:09-CT-3124-FL, 2012 WL 2339503, at *3 (E.D.N.C. June 19, 2012) (evaluating pre-trial

detainee's false arrest claim under the Fourth Amendment).  To establish a § 1983 claim based on

the Fourth Amendment for false arrest or false imprisonment, a plaintiff must show that the seizure

was made without probable cause.  See Massey v. Ojaniit, 759 F.3d 343, 356 (4th Cir. 2014).  "[T]he

concept of probable cause defies a precise definition."  United States v. Richardson, 607 F.3d 357,

369 (4th Cir. 2010).  Probable cause exists when, under the totality of the circumstances, there is a

"fair probability" that criminal activity has taken place.  Illinois v. Gates, 462 U.S. 213, 246 (1983).

Here, plaintiff argues that although he was arrested first pursuant to Lt. Baggett's probable

cause determination and then pursuant to a warrant, based on the magistrate judge's probable cause

determination, neither of these were in actuality supported by probable cause because both

determination's were based on defendant Adams's dishonesty.

In analyzing these claims, the court finds instructive the Fourth Circuit's opinion in Miller

v. Prince George's Cty., MD, 475 F.3d 621 (4th Cir. 2007).  There, plaintiff was pulled over by a

Virginia state trooper during a routine department of motor vehicles check and discovered an

outstanding Maryland warrant for theft and took plaintiff into custody.  Id. at 626.  There, as here,

the warrant had been issued based on a detective's affidavit that plaintiff alleged was dishonest.  Id.

at 627.  There, as here, the detective asserted that qualified immunity protected him from liability

for a federal constitutional violation.  Id. at 626.

The court held issues of material fact existed regarding whether the detective presented false

statements in his warrant affidavit, and the court determined, when considering the facts in light

most favorable to plaintiff, 1) a reasonable jury could conclude that the affidavit contained

misrepresentation and omissions made deliberately or with reckless disregard for the truth, 2) such

misrepresentations and omissions were material, and 3) a "corrected" affidavit, without such

misrepresentations and omissions, would not have provided probable cause. Id. at 629. The court also noted that "the fact that [the detective] was not the arresting officer [does not] eliminate his responsibility for the natural consequences of his use of intentionally or recklessly false material misstatement and omissions to obtain the arrest warrant." Id. at 630.

However, in Miller, significant evidence was presented that the detective's affidavit contained misrepresentation and omissions made deliberately or with reckless disregard for the truth. See id. at 624-26. Here, as stated previously, the only evidence before the court that defendant Adams's affidavit contained deliberate misrepresentations is plaintiff's repeated but conclusory assertions stating so:

> Lt. Baggett did not properly investigate the decision to criminally charge me with communicating threats to Juan Adams. The decision to allow Juan Adams to accuse me of threatening him was based on the fact [that] I was a pretrial detainee and [Adams] was an officer and buddy/friend of Lt. Baggett. There was no evidence supporting [Adams's] statements nor any witnesses, nor any weapons involved because I did not threaten Juan Adams.

(Pl's Aff. at 64).

Regarding plaintiff's malicious prosecution claim, "[w]hat is conventionally referred to as a '§ 1983 malicious prosecution' action is nothing more than a § 1983 claim arising from a Fourth Amendment violation." Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000) "To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012).

Because plaintiff has offered the court no evidence beyond his own conclusory allegations in support of his malicious prosecution claim, just as he failed to do so regarding his false arrest and false imprisonment claims, the court finds plaintiff has failed to demonstrate there exists a genuine

issue of material fact requiring trial. Therefore, there is no constitutional violation, defendant Adams is entitled to qualified immunity, and the court grants defendant Adams's motion for summary judgment as to these claims.

        2.      Remaining § 1983 Claims

            a.      Deliberate Indifference to Medical Needs

The court will next address plaintiff's claims concerning the medical care he received while incarcerated. "In order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (interior citation omitted). The first prong is an objective one–the prisoner must show that "the deprivation of [a] basic human need was objectively sufficiently serious"–and the second prong is subjective–the prisoner must show that "subjectively the officials act[ed] with a sufficiently culpable state of mind." Id. at 1379 (internal quotations omitted). The second prong, deliberate indifference, "sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). "[D]eliberate indifference entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994).

Plaintiff argues that he did not receive the proper dental care during his incarceration at Wake County jail, particularly with regard to the jail's alleged policy of extracting instead of treating teeth, resulting in multiple teeth being extracted from plaintiff. (DE 64 at 99-101). Plaintiff argues that although he consented to the teeth extractions, in reality he had no choice because of the pain he was in and he was provided no other options. (Id. at 101; DE 63 at 6 ("I have tried to go to the

dentist multiple times and am told each time they will only pull my teeth which is why I refuse not because I don't want treatment")).

Dr. Umesi, medical director of the Wake County jail, testified that plaintiff had a total of six dental inquires noted in his medical chart between December 12, 2014, and July 21, 2016. (DE 43 at 118). During this time he saw the dentist twice, refused to see the dentist twice as indicated by plaintiff's signed refusals, and saw the nurse twice. (Id.).

There is no indication that plaintiff's medical needs were ignored.[8] The record reveals that plaintiff was treated each and every time plaintiff requested and consented to treatment. Accordingly, plaintiff has failed to demonstrate a genuine issue of facts as to deliberate indifference to his medical needs. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (regarding medical care "disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.").

        b.      Legal Mail Claims

The court will next address plaintiff's claims concerning the way in which jail staff handled his legal mail.

In Wolf v. McDonnell, 418 U.S. 539, 577 (1974), the Supreme Court approved prison regulations requiring incoming mail identified as being from an attorney to be opened and searched in the presence of the prisoner, stating this regulation was "all, and perhaps even more, than the

---

[8] Plaintiff additionally argues that he was denied prescription medication on one occasion, wherein the staff incorrectly marked that he received it, although he did not receive the medication for 24 hours, and was "ridicule[d] by the medical staff member who refused to give him his medication and falsified records." (Amended Complaint (DE 24) at 5). However, Dr. Umesi testified that plaintiff's medical records "confim[] that inmate was never refused prescribed mediation by dispensing medical providers . . . . In review of the medication administration sheets however, the inmate has refused medications and or antibiotics on multiple occasions during each medication regimen." (DE 43 at 119). Plaintiff has failed to forecast any evidence to create a genuine issue of material fact as to this allegation.

Constitution requires." Here, plaintiff alleges 1) that the jail staff has opened and read his legal mail outside his presence and 2) at times plaintiff was informed that clerks had not received his legal mail. (Pl's. Aff. at 104-05). In support, plaintiff provides the court a letter from the jail mail room staff apologizing for opening plaintiff's legal mail on February 24, 2016. (DE 64 at 70).

Plaintiff's claims regarding his legal mail do not survive summary judgment. First, isolated incidents without negative consequences to plaintiff do not constitute a constitutional deprivation of one's rights. See, e.g., Buie v. Jones, 717 F.2d 925, 926 (4th Cir. 1983). Second, plaintiff must show actual injury or that defendants' conduct hindered his efforts to pursue a legal claim. See Lewis v. Casey, 518 U.S. 343, 351-57 (1996); Michau v. Charleston Cty., 434 F.3d 725, 728 (4th Cir. 2006); Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996). Here, plaintiff fails to allege or offer any evidence that defendants' conduct hindered his efforts to pursue a legal claim beyond stating generally that he was informed that some of his legal papers were not received by various courts. (See Pl's. Aff. at 104-05).

      c.    Claims Concerning Grievance Forms

Throughout plaintiff's filings with the court, plaintiff repeatedly makes claims concerning the mishandling of grievance forms he has previously submitted or tried to submit to Wake County jail personnel, that these grievance forms have been thrown away, lost, and have gone unanswered. Steinbeck, administrative officer for Wake County jail, testified as to the following procedures regarding grievances:

> Grievances are entered by inmates and answered by staff through kiosks in the Housing locations to which inmates are assigned. If an Inmate Housing location does not yet have kiosks, all grievances from those housing units must be in writing using Inmate Grievance Forms obtained from a housing officer, and then given to any Detention Facilities staff. In those housing units, officers are instructed to try and handle the inmate's grievance before passing them onto the grievance process

> . . . . Adverse decisions on inmate grievances can be appealed within three (3) working days to the Detention Director who will respond to the appeal in writing in a reasonable amount of time. The decision of the Detention Direction as to inmate grievances is final and concludes the administrative process for inmate grievances.

(DE 43 at 109). Plaintiff was housed in a facility where he used written grievance forms. (Id.)

The Fourth Circuit has held that a plaintiff has a right to submit grievance forms free from retaliation; however, plaintiff does not have a constitutional right to have available or to participate in an effective grievance process. See Booker v. S.C. Dep't of Corr., 855 F.3d 533, 539 (4th Cir. 2017), cert. denied, 138 S. Ct. 755 (2018), and cert. denied, 138 S. Ct. 755 (2018) ("At the outset, we preempt a possible point of confusion—Booker did not allege in his complaint that he has an absolute right to file prison grievances pursuant to the First Amendment. Rather, Booker alleged that he has a First Amendment right to be free from retaliation when he does file a grievance pursuant to an existing grievance procedure."); Adams, 40 F.3d at 74; see also Oliver v. Myers, No. 5:7:08-CV-558, 2008 WL 5212409, at *4 (W.D. Va. Dec. 12, 2008) (stating that "because state grievance procedures are separate and distinct from state and federal legal procedures, an institution's failure to comply with state grievance procedures does not compromise its inmates' right of access to the courts") (citation omitted), appeal dismissed, 335 Fed.Appx. 317 (4th Cir. 2009). Further, even if available, a prison grievance procedure does not confer any substantive right upon inmates. Adams, 40 F.3d at 75; see also Bradley v. Wheeler, No. 1:09cv371, 2009 WL 2634753, *4 (E.D. Va. Aug. 25, 2009).

Accordingly, all claims made by plaintiff regarding the mishandling of his grievance forms are dismissed.

d.    Excessive Lockdown

The Fourteenth Amendment generally prohibits conditions of confinement that amount to punishment before a proper adjudication of guilt.  Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir.1992).  To establish a conditions of confinement claim pursuant to the Fourteenth Amendment, a pretrial detainee must show either (1) an expressed intent to punish; or (2) lack of a reasonable relationship to a legitimate non-punitive governmental objective, from which a punitive intent may be inferred.  Martin v. Gentile, 849 F.2d 863, 870 (4th Cir.1988).  Prohibited punishments include those which "involve the unnecessary and wanton infliction of pain."  Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153 (1976)).

Plaintiff alleges he was subjected to hundreds of hours worth of lockdowns and segregation due to shortages of jail staff, including every Friday night, with too few hours of recreation and no opportunity for fresh air, in violation of jail policy.  (Pl's. Aff. at 102-3).  Except plaintiff's reference to Friday nights, plaintiff provides no specific information as to these lockdowns.

Steinbeck testified as to the following procedures concerning Friday night lockdowns:

> This was not punishment but rather is normal policy and procedure on Friday night when persons who are sentenced by the courts to weekend periods of confinement at the Wake County Jail are process into the jail at the Public Safety center.  The average number of in-processing weekend inmates on Friday nights is in excess of 70 inmates.  Public Safety Center pods are locked down during this time for every inmate except for the Pod Trustee who is in charge of cleaning the Pod so Detention Staff members can assist with weekender intake for the large number of weekender inmates reporting in on Friday nights.

(DE 43 at 113-12).

Plaintiff has presented no evidence that the lockdowns at issue here were used to punish him, nor has he shown that there was not a legitimate, non-punitive basis for their use.  See  Worrell v. Sparks, No. 5:14-CT-3092-D, 2015 WL 12914310, at *8 (E.D.N.C. Mar. 24, 2015) ("Plaintiffs, who

acknowledge that the policy applies uniformly to certain pretrial detainees, have failed to raise a genuine issue of material fact as to whether the lockdown was imposed as a form of punishment or whether the policy lacked a reasonable relationship to legitimate managerial objectives.").

As to plaintiff's allegations that defendants have not followed their own policies and procedures in restraining residents, the violation of a policy or procedure by defendants, even if such a policy had been shown in evidence, is not in and of itself a violation of plaintiff's constitutional rights, and is therefore not a claim assertable under § 1983. See Riccio v. Cty. of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir. 1990) ("Alleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures, even when those state-created procedures exceed the amount of process otherwise guaranteed by the Constitution.").

> e.    Verbal Abuse

Throughout plaintiff's filings with the court, plaintiff asserts that various jail personnel verbally abused plaintiff for various reasons. However, it is well-settled that allegations of verbal abuse and threatening language, standing alone, do not state a claim for relief under § 1983. See Collins v. Cundy, 603 F.2d 825, 827 (10th Cir.1979), cited favorably in, Moody v. Grove, 885 F.2d 865 (4th Cir.1989) (table) (unpublished) (stating as a general rule that verbal abuse of inmates by guards, without more, does not state a constitutional claim); Morrison v. Martin, 755 F.Supp. 683, 687 (E.D.N.C.1990) (same).

Accordingly, all claims made by plaintiff regarding verbal abuse are dismissed.

3. Remaining Defendants

The court additionally finds that plaintiff's claims against defendant Sheriff's Office and defendant Harrison must be dismissed.

a. Claims Against Wake County Sheriff's Office

Defendant Sheriff's Office is not a legal entity capable of being sued. State law determines whether a state governmental agency has the capacity to be sued. Fed. R. Civ. P. 17(b)(3) ("Capacity to sue or be sued is determined . . . by the law of the state where the court is located."). In the instant case, there is no North Carolina statute authorizing suits against sheriff's departments. Cf. N.C. Gen. Stat. § 58-76-5 (authorizing suits against sheriffs). This court has repeatedly found that sheriff's departments lack capacity to be sued in North Carolina. See, e.g., Dillon v. Mills, No. 4:16-CV-00003-FL, 2016 WL 3102015, at *2 (E.D.N.C. June 2, 2016) (citing Parker v. Bladen County, 583 F.Supp.2d 736 (E.D.N.C. 2008) ("District courts in North Carolina have found that sheriff departments do not have capacity to be sued."); McCallister v. Lee, No. 7:13-CV-154-FL, 2014 WL 3700337, at *1 (E.D.N.C. July 24, 2014), aff'd, 585 F. App'x 56 (4th Cir. 2014) ("Under North Carolina law, [the Onslow County Sheriff's Department] is not an independent legal entity with the capacity to sue and be sued.").

Defendant Sheriff Office lacks the capacity to be sued under North Carolina law, and therefore defendants' motion for summary judgment as to claims against defendant Sheriff's Office is granted.

b. Claims Against Defendant Harrison

Claims against city officials in their official capacity are in all respects, for purposes of § 1983, "treated as suits against the municipality." Santos v. Frederick Cnty. Bd. of Comm'rs, 725

F.3d 451, 469-70 (4th Cir. 2013). "[A] municipality is subject to Section 1983 liability only when its 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury.'" Id. (quoting Monell v. Dept. of Social Services of the City of New York, 436 U.S. 658, 694 (1978)).

"An official policy often refers to 'formal rules or understandings that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.'" Semple v. City of Moundsville, 195 F.3d 708, 712-13 (4th Cir. 1999) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986)). "While municipal policy is most easily found in municipal ordinances, 'it may also be found in formal or informal ad hoc 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy.'" Edwards v. City of Goldsboro, 178 F.3d 231, 244-45 (4th Cir. 1999) (quoting Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir.1987)). In addition, municipal policy may include "practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011).

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985). By contrast, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." Id. at 824.

Plaintiff has not forecasted any evidence to create a genuine issue of fact as to liability of defendants in their official capacity.[9] Although plaintiff states that "these constitutional violations were committed as a result of the policies and customs of the Wake County Sheriff's Office," he offers no evidence to support this assertion. (DE 24 at 1). Here, although plaintiff argues that it was common practice or custom for Wake County jail staff to ignore complaints, "cover up" each other's actions, and engage in a "code of silence," he does not identify any official policy causing his alleged constitutional deprivations.

Plaintiff also seeks to hold defendant Harrison liable in his individual capacity under § 1983. Because Harrison was not present for plaintiff's detention, plaintiff proceeds under a theory of supervisory liability. To establish supervisory liability under § 1983, a plaintiff must show that the supervisor had actual or constructive knowledge of his subordinate's conduct, that the supervisor was deliberately indifferent to this knowledge, and that the supervisor's inaction caused the plaintiff's injury. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.1994). Constructive knowledge is imputed when "the conduct is widespread, or at least has been used on several different occasions." Id. A single incident or a series of isolated incidents are insufficient to establish supervisory liability. Slakan v. Porter, 737 F.2d 368, 373 (4th Cir.1984).

In this case, plaintiff has not shown that defendant Harrison had actual or constructive knowledge of defendant Adams's conduct, that defendant Harrison was deliberately indifferent to this knowledge, or that defendant Harrison's inaction caused plaintiff's injury. To the extent plaintiff maintains that his "notice of intent" mailed to defendant Harrison put defendant on notice, plaintiff's "notice of intent" primarily concerns the alleged verbal abuse of Cooke, and only states

---

[9] This holding applies to both defendant Adams and defendant Harrison.

in a general way that "Wake County detention officers are notorious for overlooking or trying to cover up other officers misconduct . . . knowing the punishment will be segregation see Jilani v. Harris," and does not mention defendant Adams. (DE 64 at 74-75).

In sum, defendants' motion for summary judgment as to claims against defendant Harrison is granted.

4.    State-Law Claims

Plaintiff additionally alleges the following violations under North Carolina law: intentional infliction of emotional distress, false arrest or imprisonment, and malicious prosecution.

A district court may decline to exercise supplemental jurisdiction over a claim if the district court dismisses all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3); see Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995); see also Gantt v. Whitaker, 203 F.Supp.2d 503, 512 (M.D.N.C. Feb. 26, 2002) (declining to exercise supplemental jurisdiction over plaintiff's state law claims including those again the sheriff's official bond), aff'd, 57 Fed. Appx. 141 (4th Cir. 2003). The court declines to exercise its supplemental jurisdiction over such claims. Accordingly, plaintiff's state-law claims are dismissed.

## CONCLUSION

Based on the foregoing, defendants' motions for summary judgment (DE 38) is GRANTED, plaintiff's federal claims are DISMISSED, and plaintiff's state-law claims are DISMISSED without prejudice. The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of March, 2018.


_____
LOUISE W. FLANAGAN
United States District Judge